**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **23-cr-168 (RCL)** |
| **RAYMON DANDRIDGE** | : | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Pursuant to a negotiated plea agreement, Raymon Dandridge entered a guilty plea to one count of distribution of child pornography. He will appear before this Honorable Court for sentencing on January 15, 2025. The parties agree that the applicable sentencing range under the United States Sentencing Guidelines is 180 to 188 months. The government requests a sentence at the high end of the range, 188 months. *See* Government's Sentencing Memorandum, ECF 41. Because Mr. Dandridge has a prior conviction, the mandatory minimum term of incarceration required by statute is a term of 180 months, *see* 18 U.S.C. § 2252(a)(2). As discussed below, a review of the sentencing factors set forth in 18 U.S.C. § 3553(a) demonstrates that no greater term is necessary to serve the purposes of sentencing.

The government also requests a life-time term of supervised release, while the Probation Office recommends a 25-year term of supervised release. Given the circumstances of this case, Mr. Dandridge's background, the required 15-year term of incarceration, the statutory requirement that Mr. Dandridge register as a sex offender for a period of 25 years following his release from incarceration, and Mr. Dandridge's age, neither a life-time nor a 25-year term of supervised release is necessary to ensure Mr. Dandridge successfully reintegrates into the community following his release. Instead, a 15-year term of supervision would be sufficient.

The Court also must impose restitution, and three individuals identified in the images possessed by Mr. Dandridge have requested restitution. Although the government submitted substantial evidence of the harm caused to these individuals, the government has not submitted an argument demonstrating that Mr. Dandridge's relative role in the causal process supports more than the statutory minimum restitution of $3,000 per victim. For this reason, the Court should impose the $3,000 minimum required amount of restitution for each of the three victims, for a total of $9,000.

Mr. Dandridge respectfully requests that the Court recommend the federal Bureau of Prisons ("BOP") designate him to serve his term of incarceration at FMC Devens, one of two locations where the BOP offers a residential Sex Offender Treatment Program. Mr. Dandridge experienced a great deal of trauma as a child and has struggled with mental health disorders throughout his life. As the government acknowledges, ECF 41 at 12, these issues contributed to the offense conduct. Prior to his incarceration in this case, Mr. Dandridge was not offered treatment for the trauma he suffered as a child or his mental health disorders. Since his incarceration, he has been diagnosed and medicated for his mental health conditions and received some therapy. He wants to continue that treatment and participate in the BOP residential sex offender program, which offers treatment five days per week in a residential housing unit.

## Argument

When imposing a sentence, the Court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any

victims of the offense. *See* 18 U.S.C. § 3553(a). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, and mental and emotional conditions. *See* 18 U.S.C. § 3661. Congress has further provided that when determining the length of any prison term, courts should "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582. With that limitation, and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than *necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a).

## I.  The United States Sentencing Guidelines

The Guidelines support a sentence of no more than the statutory mandatory minimum term. As the parties have agreed, the applicable Guidelines range is 151 to 188 months. ECF 29 at 4. Due to the statutory mandatory minimum, however, the Court is required to sentence Mr. Dandridge near the top of that range, 180 months. The Guidelines do not support the government's argument for a further increase to the very top of the range, 188 months.

The Guidelines range not only fully accounts the offense conduct, but is based on U.S.S.G. § 2G2.2, which has been widely criticized because as applied in non-production child pornography cases, such as this case, it requires the now routine application of enhancements that were intended to apply to and differentiate the most serious child pornography offenses.[1]

---

[1] *See* United States Sentencing Commission, *Federal Sentencing of Child Pornography: Non-Production Offenses* (June 2021) ("2021 Report") at 5; *see also* United States Sentencing Commission, *Report to the Congress: Federal Child Pornography Offenses* (2012) ("2012 Report") at ii, 323. In these reports, the Commission found that as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability," explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that

For this reason, "judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often imposing variances pursuant to 18 U.S.C. § 3553(a)." June 2021 Report at 3.

As applied here, at least two of the offense level enhancements that have been criticized for no longer serving the purpose of differentiating between offenders have substantially increased the advisory range. These are: § 2G2.2(b)(6) (adding 2 levels for use of a computer) and § 2G2.2(b)(7)(D) (adding 5 levels for the number of images). Together, these enhancements more than double the advisory range, increasing it from a range of 70 to 87 months (at offense level 27) to a range of 151 to 188 months (at offense level 34). The 180-month mandatory

---

previously was not widely circulated." *Id.* at 6. The Commission found that the cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.* at 323.

*See also United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); *United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (finding district court did not abuse discretion by imposing policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (finding *Kimbrough*'s holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) (child pornography "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *see also United States v. Grober*, 595 F. Supp. 2d 382, 397 (D.N.J. 2008), *aff'd*, 624 F.3d 592 (3d Cir. 2010) (using the offense characteristics "to enhance the base offense level [of § 2G2.2] is irrational because logically and factually, the characteristics are simply not genuine aggravating factors. Rather, they are inherent in just about any downloading offense").

minimum would be the Guidelines range absent these enhancements. Because these enhancements are applied, the mandatory minimum is only the bottom of the range and the top of the range is 188 months, but these enhancements do not differentiate between offenders or support a finding that Mr. Dandridge's offense requires more than the substantial mandatory term of 15 years.

## II.  History and Characteristics of Mr. Dandridge

Mr. Dandridge's life has been marked by trauma and untreated mental health disorders. He grew up in rural Maryland. His great grandmother lived on a tobacco farm where his family had worked for multiple generations as sharecroppers. His grandparents were the first generation to move away from sharecropping when his grandfather began work as a janitor. His mother was raised on a nearby farm in Calvert County, Maryland. Mr. Dandridge was born in September 1984. He is an only child, and his parents had a tumultuous relationship. His father abused alcohol, and when he was drunk, he would physically and emotionally abuse his mother. From a young age, Mr. Dandridge witnessed his father's violence towards his mother. In addition to alcohol abuse, his father's ability to parent Mr. Dandridge was hampered by his own intellectual disability.

While his father was cold and emotionally unavailable, his mother was warm and affectionate, and she was the center of his world. Tragically, when he was about nine years old, his mother was diagnosed with lung cancer. When she was first diagnosed, the family did not explain this to young Mr. Dandridge. The family waited to tell him about his mother's cancer until there was no hope left. She died the following day. Her death, of course, was traumatic for Mr. Dandridge. He was just ten years old and unable to process the loss; in his grief, he attempted to take his own life, wanting nothing more than to be with his mother. Despite his

obvious trauma and inability to cope with the loss, his father did not seek mental healthcare for him, but rather discouraged him from crying or expressing any emotion. Family members urged his father to take Mr. Dandridge to a mental health professional to help him process his grief, but his father refused.

Mr. Dandridge's inability to process the loss of his mother was complicated by his experiences at the home of a babysitter. Mr. Dandridge was frequently left in the care of a woman who provided childcare services for a number of children in the neighborhood but was not an appropriate caregiver. Her behavior was sexually inappropriate and she permitted older children in the household to sexually abuse the younger children. From a very young age, Mr. Dandridge experienced this abuse which continued for years.

Despite all of his hardships growing up, Mr. Dandridge worked hard to obtain an education, but left untreated, his mental health deteriorated when he was in high school. He began to experience racing thoughts that he could not turn off. He would stay up all night plagued with anxiety, unable to sleep. He began eating as a coping mechanism and weighed more than three hundred pounds. He began drinking alcohol and smoking marijuana to self-medicate, and on several occasions attempted suicide by mixing Percocet with alcohol.

Despite his mental health struggles and long absences from school, Mr. Dandridge graduated from high school in 2002. Throughout his life, Mr. Dandridge's father not only relied on his son to compensate for his own intellectual disability, but also relied on Mr. Dandridge financially. When he was fifteen, Mr. Dandridge started working to help support himself and his father. He first worked at a Food Lion store, then at various fast-food restaurants. Following his high school graduation, he continued to work in retail, earning minimum wage. Although he

frequently changed jobs in search of better opportunities, for more than 20 years, he maintained employment and led a quiet life.

Throughout these years, he continued to struggle with his mental health. Although he experienced serious mental health symptoms, including suicidal thoughts and attempts to take his own life, Mr. Dandridge did not receive any mental health treatment. As a young man, he leaned on one of his cousins, who struggled with her own mental health. They shared their struggles with each other and, while this was obviously not the therapy he needed, Mr. Dandridge found comfort in talking with someone who was experiencing a similar struggle with depression. Together, they used alcohol and later PCP to self-medicate. His cousin was his closet friend in the years following his mother's death, but tragically, she succumbed to her own struggles and committed suicide in 2012. Her suicide was devastating and left another huge hole in Mr. Dandridge's life.

Mr. Dandridge continued to struggle with his mental health, but also continued to stay out of trouble, keeping to himself. In 2016, he decided to return to school and enrolled at Anne Arundel Community College. He studied psychology for two years and tried to build a more promising future. Unfortunately, he struggled financially and was unable to continue paying tuition.

In 2020, when the COVID-19 pandemic began, Mr. Dandridge was working at Service Master Cleaners. In July 2020, after the company refused to provide proper protective equipment, Mr. Dandridge resigned. At this point, his life began to spiral out of control. He began watching pornography obsessively and had frequent casual sexual encounters with adults who were in other committed relationships. As Mr. Dandridge explains it, when these adults chose to be with him rather than their partners or family, he felt valued.

Mr. Dandridge managed to find new employment doing the payroll for a local steakhouse, but his mental health was at its worst. He again began using PCP, marijuana, and excessive amounts of alcohol to self-medicate. He also continued to have casual sexual encounters and spent hours viewing pornography online. This obsession began with adult pornography but devolved into viewing unlawful pornography. He cannot fully explain why he viewed these materials or entered chatrooms with others viewing these materials, but it stemmed from his desire to connect with the other adults viewing these materials. Like his other sexual encounters, he felt valued when these adults who claimed to be interested in children would choose him instead. It gave him an odd sense of value. He is deeply ashamed that he did not stop to think of the damage that viewing and sharing these materials did to the children depicted.

As a result of his conduct, in August 2022, he was convicted in Anne Arundel County for possessing child pornography. He recognizes that his arrest in 2022 should have been a turning point, and he should have obtained the treatment he needed following that conviction. He continued to struggle with his mental health and shared his struggles with his probation officer, hoping to obtain help. He participated in the treatment that was provided. Unfortunately, that treatment was not substantial or conducive to rehabilitation. The meetings were conducted by Zoom and lacked privacy. Other participants appeared to have unknown individuals in the same room with them, and his probation officer frequently attended the sessions. Mr. Dandridge expressed these concerns to his probation officer, who then moved him to a smaller group in March 2023. The probation officer's notes confirm that Mr. Dandridge participated in this smaller group and started the process of opening up to obtain the benefits of treatment. Mr. Dandridge, however, was still struggling and had not received mental health treatment. In April 2023, he was arrested for the instant offense.

8

Following his detention, Mr. Dandridge was diagnosed with schizoaffective disorder, anxiety, and depression, and for the first time in his life, he has received mental health treatment, including medication and therapy. The District of Columbia jail medical records include a notation that "he has had a lot of trauma in his life from his mother passing when he was 10 years old, to multiple car accidents, some sexual assaults when he was a child." The records also note that he has hallucinations and with medication, experienced a "significant reduction in the frequency of [hallucinations] and improved in the symptoms of depression." Mr. Dandridge is grateful for the relief the prescribed medications have brought, and grateful for the therapy he has been afforded at the jail. While he does not have as much access to a therapist as he would like, he has learned that therapy can offer coping skills and relief.

Mr. Dandridge's family also has recognized the difference mental health treatment has made, noting the positive changes they attribute to medication and therapy. Despite the nature of the charges, since his detention, Mr. Dandridge's family has been very supportive. Despite the stigma his family previously attached to mental health treatment, they now recognize and accept Mr. Dandridge's struggle with his mental health and his need for treatment. Through daily phone calls, Mr. Dandridge has developed a closer relationship with his father, and like many other family members, his father plans to support him through his sentence and recovery. *See* Exhibit 2 (letters of support).

The time Mr. Dandridge has spent at the jail has been difficult and has made a lasting impression. In part due to the charges against him, his time there has been particularly challenging. He was accosted by other inmates in July 2023 and placed in a separation unit a short time later. He has been on that unit now for more than a year. Most of his time is spent alone in his cell. The effects of this isolation have been difficult. Nonetheless, he has tried to be

productive. He obtained a job working on the cleaning detail and completed numerous in online educational courses, completing classes in food safety, electrical work, and psychology, along with a science course taught by Neil deGrasse Tyson and a writing course taught by Malcolm Gladwell. . *See, e.g.,* Exhibit 3 (certificates). Currently, he is enrolled in biology and algebra courses

In addition to obtaining mental health treatment, taking educational courses, and building stronger relationships with the people in his life, Mr. Dandridge has developed a relationship with God. He attends church services, reads the Bible, and discusses verses with family members during their telephone calls.

Mr. Dandridge is determined to continue his treatment and education as he serves the lengthy term of incarceration the Court must impose. He knows he will need mental health treatment for the remainder of his life to ensure he is able to cope with his mental health disorders and past traumas. He is grateful that he now has treatment and the full support of his family.

Mr. Dandridge's history and characteristics support a finding that a 15-year sentence is sufficient to serve the purposes of punishment and deterrence, while providing the necessary treatment. The government notes that a risk-assessment evaluation places Mr. Dandridge at a "well above average risk" to reoffend, but that risk level is based on his prior conviction which occurred shortly before the instant offense and for which he received only a 30-day sentence, not the substantial 15-year sentence required here or the necessary and substantial treatment he will receive through the BOP.[2]

---

[2] Moreover, the government frequently acknowledges that these risks assessments "are of minimal value to the Court" and argues against reliance on them. *See, e.g. United States v. Gregory Barnhart-Moore*, 22-cr-127 (CJN), ECF 42 at 14-17.

**III. The Nature and Circumstances of the Offense.**

There is no doubt that the distribution of child pornography is a very serious offense that causes significant further harm to the children depicted in the images possessed and distributed. The mandatory minimum 15-year term fully accounts for the nature and circumstances of the offense.

In seeking a term above the mandatory minimum, the government focuses on the text exchange Mr. Dandridge had with the government's undercover employee (UCE), during which he agreed to meet with the UCE, who claimed to have an 8-year-old daughter. In those text messages, the UCE offered to drug his purported 8-year-old daughter and suggested she could then be assaulted. Mr. Dandridge, however, knew that individuals on the internet engaged in "fantasy talk" (which he referred to in his text messages), and he believed that is what this was. Moreover, that plan was not Mr. Dandridge's idea or plan, as the government suggests. He did not initiate the plan regarding the UCE's purported 8-year old. The UCE did. As the chats demonstrate, Mr. Dandridge did make statements consenting to the plan—saying it would be the first he was involved in such conduct—but his true intent was to meet with the adult UCE. As discussed above, he was seeking validation by obtaining the attention of the UCE. Most importantly, there is no evidence that Mr. Dandridge ever engaged in a contact offense.

Again, Mr. Dandridge recognizes that possession and distribution of child pornography alone is a significant offense—causing grave harm to the children involved. He also knows that the gratification he received from obtaining attention from adults who were either committed to others or interested in children was not healthy. He knows he needs treatment, and the 15-year mandatory minimum term is a substantial and sufficient punishment for his conduct and a sufficient term during which the BOP can provide the needed treatment.

**IV. Purposes of Sentencing.**

The Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offender affords adequate deterrence, and protects the public. Under the circumstances of this case, the mandatory minimum term of 180 months is more than sufficient to serve these purposes. Mr. Dandridge has spent the nearly two years at the D.C. Jail. The conditions within the District of Columbia Department of Corrections are harsh and this experience, along with the remainder of the 15-year mandatory minimum term of incarceration, will serve as a substantial deterrent.

Mr. Dandridge also must register as a sex offender, with the publication of the information about this case to the community and his friends and neighbors. This sex offender designation will effectively make him a societal outcast for the 25 years following his release, making finding employment and housing extremely difficult. As several courts have recognized, collateral consequences of a conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming

12

below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of prosecution).

The 15 year mandatory minimum will also serve as a substantial deterrence and no greater term is necessary to do so. Contrary to the government's argument, the empirical evidence demonstrates that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The 2021 Report from the Sentencing Commission demonstrates that offenders charged with non-production child pornography offenses are far less likely to recidivate than offenders charged with other offenses. In the 2021 Report, the Commission found that non-production

13

child pornography offenders had a recidivism rate of 27.6%. 2021 Report at 65. By comparison, the Commission has found that offenders charged with firearm offenses have a 68% recidivism rate; drug traffickers have a 50% recidivism rate, and those charged with fraud have a 34% recidivism rate. *See https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/rg_recidivism-series.pdf.*

The Sentencing Commission also has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Sentencing Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and [peer to peer] file-sharing." 2012 Report at 98.

14

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research. In the 2021 Report, the Sentencing Commission found that the percentage of child pornography offenders released from incarceration or placed on probation in 2015 that were rearrested for a sex offense within three years was a little as 4.3%. 2021 Report at 7. *See also* Helen Wakeling et al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (0.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse 201, 207-08 & tbl. III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of

internet offenders would appear to pose a very low risk of sexual recidivism"). As one district court put it, "the empirical literature [] generally concludes that there is little—if any—evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *United States v. Marshall*, 870 F. Supp. 2d 489, 492 (N.D. Ohio 2012), *aff'd*, 736 F.3d 492 (6th Cir. 2013).

The government ignores the findings related to child pornography offenders and instead cites data regarding offenders who engaged in contact offenses against minors to argue that recidivism rates for child pornography offenses are high. The authorities cited by the government are not appliable here and do not support a finding that child pornography offenders have high recidivism rates. The government argues that "Congress and the courts have recognized the high recidivism rates for *these types of offenders*." ECF 41 at 17 (emphasis added). By "these types of offenders," the government refers to child pornography offenders, but cites only authorities referring to contact offenders. *Id.* (citing Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century: Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L.Rev. 1155, 1192, n.150 (2009)). The Blaisdell Note was written by a law student at Valparaiso University Law School in 2009 and states, "Sex offenders who commit acts of sexual violence against children have one of the highest rates of recidivism among all criminals," and cites to recidivism statistics for "rapists" and "child molesters." Blaisdell at 1192 n.150. The article, as the government notes, cites statements by three members of Congress, but those citations also refer to contact offenders and do not refer to any statistics for non-contact, non-production child pornography offenders. Further, the Blaisdell article does not address or argue for lengthy terms of incarceration, but rather advocates for computer restrictions for offenders on supervised release.

16

In addition to the Blaisdell article, the government cites *United States v. Accardi*, 669 F.3d 340 (D.C. Cir. 2012) as support for a lengthy term of incarceration, quoting *Accardi* as: "noting that 'a number of circuits have upheld [sentences] . . . for defendants convicted of possession of child pornography based on the same general concerns about recidivism[.]'" ECF 41 at 17. The government, however, left out the part of that quotation that demonstrates the court was referring to terms of supervised release, not incarceration, and did not base its decision on recidivism concerns alone. The sentence partially quoted by the government referred to the court's finding that a 40-year term of supervised release did not create an unwarranted disparity, and the full quote is: "Moreover, a number of circuits have upheld lifetime terms of supervised release for defendants convicted of possession of child pornography based on the same *general concerns* about recidivism, protection of the public, and rehabilitation that animated the district court's decision here." *Accardi*, 669 F.3d at 346 (emphasis added). The court made no reference to any statistical support for a finding that child pornography offenders had a high rate of recidivism, as the government suggests, but rather referred to "general concerns."

Similarly, *United States v. Cope*, 527 F.3d 944, 952 (9th Cir. 2008), cited by the government, addressed the need for life-time supervised release based on "general concerns" regarding recidivism—not statistics demonstrating a rate of recidivism. And in *Copes*, the defendant had a prior conviction for attempted sexual abuse of his daughter. *Id.*

The government also cites *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008), which notes: "As Congress has found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported." *Id.* (citing *United States v. Allison*, 447 F.3d 402, 405-06 (5th Cir. 2006)). *Allison*, however, like the authorities above, cited general concerns about recidivism for "perpetrators of child sexual abuse crimes"—not data for

child pornography offenses. 447 F.3d at 405-06.

The government also only partially quotes *United States v. Garthus*, 552 F.3d 715, 720 (7th Cir. 2011), ignoring the most relevant portion of that decision. In *Garthus*, the court noted that "[s]ome studies show a high rate of recidivism among pedophilic sex offenders generally, ranging from 10 percent to 50 percent. . . . Another study found that only 6.8 percent of consumers of child pornography had been charged with a new child-pornography offense within 4 years but that the percentage rose to 9.5 percent within 6 years." *Id.* Again, the high rates of recidivism refer to contact offenders, while, as the statistics noted by the court demonstrate, non-contact child pornography offenders have relatively low recidivism rates. As the *Garthus* court noted, "It's a mistake to lump together different types of sex offender." *Id.* In *Garthus,* the court found, based on prior allegations against the defendant, that he was "more dangerous than the average consumer of child pornography. A pedophilic sex offender who has committed both a child-pornography offense and a hands-on sex crime is more likely to commit a future crime, including another hands-on offense, than a defendant who has committed only a child-pornography offense." *Id.* Mr. Dandridge has no history of any contact offense.

In short, the government offers no statistical evidence or support for its argument that child pornography offenders have a high rate of recidivism. To determine the recidivism rate of child pornography offenders, the Court should look to the data for child pornography offenders collected by the United States Sentencing Commission and others, as discussed above.

## V.  The Need to Avoid Unwarranted Disparities.

The Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). "Unwarranted disparity is defined as different treatment of *individual* offenders

18

who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

Here, the statute requires the mandatory minimum term of 180 months and sentencing statistics demonstrate that any greater sentence would constitute an unwarranted disparity. As the statistics submitted by the Probation Office demonstrate, even defendants who have the same offense level, but a more complex criminal history placing them in Criminal History Category II, on average are sentenced well below 180 months. For these defendants, in fiscal years 2019 through 2023, the average sentence of imprisonment was 125 months, and the median length of imprisonment was 120 months. PSR ¶ 115. Sentencing Mr. Dandridge to more than the required 180 months would create an unwarranted disparity.

## VI. Restitution

As the government recognizes, the Court must "order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses." *Paroline v. United States*, 572 U.S. 434, 458 (2014). The government submits the statements of three victims, and Mr. Dandridge recognizes that they suffered substantial harm from the abuse depicted in the images possessed and that harm is exacerbated by every viewing of the images. One victim noted she had received more than 22,000 notifications of viewings.

Congress has set the minimum restitution amount per victim in child pornography cases at $3,000. The government has requested $5,000 per victim, but offers no explanation of Mr. Dandridge's relative role to support that amount. Therefore, no more than the required $3,000 per victim should be imposed here.

Imposing an increased restitution amount will place a substantial burden on an already impoverished defendant. When Mr. Dandridge is released from serving his fifteen-year sentence, he will be more than 50 years old and a registered sex offender with a very serious criminal record based on this case. Finding even a minimum wage job to support himself will be difficult. While the Court must impose an order of $3,000 per victim, for a total of $9,000, imposing an additional $2,000 per victim will do little to assuage the undeniable pain these victims have suffered. Adding an additional $6,000 financial strain on Mr. Dandridge—and likely by extension his family—will, however, make his successful transition back to the community unnecessarily more difficult.

The Court should similarly reject the government's request that restitution payments begin while Mr. Dandridge is serving his term of incarceration through payments of "the greater of $25 or 50% of the deposits in his inmate trust account per quarter." Mr. Dandridge is indigent. His family also has limited resources, and if they place money in his inmate trust account, that money would be small amounts to allow Mr. Dandridge to obtain necessities that are not supplied by the Bureau of Prisons. Requiring payments through this account would not serve the purposes of restitution because doing so would result in Mr. Dandridge's family, not Mr. Dandridge, making the payments. Similarly, the government's request that Mr. Dandridge make payments of no less than $1,000 per month following his release would be counterproductive to the goal of ensuring that he is successful upon release, by imposing a devasting and unrealistic financial burden.

## Conclusion

For the foregoing reasons, Mr. Dandridge respectfully requests the Court impose the mandatory minimum 15-year term of incarceration, followed by a 15-year term of supervised release, and a restitution order of no more than $3,000 per victim to be paid following his release from incarceration at a rate to be determined by the Probation Office based on his income. In addition, Mr. Dandridge asks that the Court recommend he serve his sentence at FMC Devens, one of two facilities where residential sex offender treatment is available. Anecdotally, undersigned counsel notes that tracking client designations compared to court designation recommendations demonstrates that adding a simple statement to a judgment noting that the court recommends designation to a particular facility seems to rarely result in designation to the recommended facility. However, when courts include a specific basis for a designation, the Bureau of Prisons seems to place greater weight on the recommendation, resulting in client placement at the recommended facility. For this reason, Mr. Dandridge specifically requests that the judgment include the following language: "The Court strongly urges the Bureau of Prisons to designate Mr. Dandridge to FMC Devens where he can participate in the Residential Sex Offender Treatment Program. Due to Mr. Dandridge's prior conviction and mental health history and background, the Court finds that Mr. Dandridge would benefit from this program."

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004

21